FILED

2026 Mar-19  PM 03:07
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| AERICA SIMS, as Administratix of the Estate of JAYCEON SIMS, deceased; and, ROBERT SIMS, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>POLARIS, INC.; POLARIS INDUSTRIES, INC.; POLARIS SALES, INC.; and, INDIANA MILLS & MANUFACTURING, INC.,)<br><br>Defendants. ) | Civil Action No. 5:23-cv-644-CLS |

## MEMORANDUM OPINION

Jayceon Sims suffered fatal injuries on July 4, 2021, when the all terrain vehicle in which he was riding as a passenger rolled over.  He was fifteen years old. The vehicle was driven by his father, Robert Sims, who was injured but survived. Mr. Sims and Jayceon's mother, Aerica Sims, acting as administratrix of her son's estate, subsequently commenced this action against the three entities allegedly responsible for manufacturing the vehicle (Polaris, Inc.; Polaris Industries, Inc.; and Polaris Sales, Inc.),[1] as well as the company that allegedly manufactured and supplied

---

[1] Doc. no. 1 (Original Complaint), ¶¶ 3-5.

the seat belts used in the vehicle ( Indiana Mills & Manufacturing, Inc.).[2]  The claims against defendant Indiana Mills & Manufacturing, Inc., were dismissed on January 21, 2025, in accordance with the parties' joint motion.[3]  The present opinion addresses two motions:  the Polaris defendants' motion for summary judgment;[4] and, plaintiffs' motion to strike portions of the declaration submitted by Jack Anglea, Polaris' corporate representative.[5]

## I.  FACTS

The all terrain vehicle driven by Robert Sims on the date of the events leading to this suit was a 2020 Polaris Ranger Crew XP 1000.  The identification number assigned to the vehicle was 4XARRX999L8049699,[6] but for convenience it will be referred to in this opinion by only the last two digits, "99."  March 19, 2026

The plant in which vehicle No. 99 was fabricated, and the land on which the facility is located, are situated in that portion of Limestone County, Alabama, which

---

[2] *Id*. ¶ 7.  Jurisdiction was founded upon 28 U.S.C. § 1332(a)(1), based upon the parties' complete diversity of citizenship and an amount in controversy exceeding $75,000, exclusive of interest and costs.  *Id*. ¶ 8.  When jurisdiction is founded upon the diversity statute, considerations of comity and the *Erie* doctrine compel the court to apply state substantive law, but federal procedural and evidentiary rules.  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *see also*, *e.g.*, *Klaxon Co. v. Stentor Electric Manufacturing Co*., 313 U.S. 487, 496-97 (1941); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc*., 666 F.2d 492, 494-45 (11th Cir. 1982).

[3] *See* doc. no. 72 (Joint Motion to Dismiss With Prejudice), and doc. no. 75 (Order Dismissing Fewer Than All Defendants and Partial Judgment).

[4] Doc. no. 58 (Polaris Defendants' Motion for Summary Judgment).

[5] Doc. no. 88 (Motion to Strike Declaration of Jack Anglea).

[6] *See* doc. no. 68-1 (Sealed Anglea dep.), at 103.

is within the corporate limits of the City of Huntsville, Alabama.[7]  As best this court

has been able to ascertain from the pleadings, briefs, and oral arguments of counsel,

both the Limestone County land and the manufacturing facility located on that

property are *owned by* "Polaris, Inc.," but *operated by* "Polaris Industries, Inc."  The

entity known as "Polaris Sales, Inc.," does not have either an ownership interest in,

or operational control over, either the Limestone County land or manufacturing

facility.[8]  Nevertheless, the nuances of those corporate distinctions have no bearing

upon the merits of the arguments addressed in this opinion, because all of the Polaris

companies are defendants, and have joined in the motion for summary judgment.

Unless context dictates otherwise, therefore, all of the Polaris entities will be referred

to in this opinion by the terms "Polaris" or "the Polaris defendants."

Polaris began production of the subject all terrain vehicle on or about July 2,

2020.[9]  The identification number ending in "99" was assigned to the vehicle for

inventory control purposes, but not then embossed onto its metal frame, allegedly

because the plant's stamping machine was not operable.[10]  In fact, that number was

---

[7] *See* doc. no. 103 (Notice Stating Location of Polaris Manufacturing Facility).

[8] The Polaris defendants contend that completed vehicles are transferred ("sold") by "Polaris Industries, Inc.," to "Polaris Sales, Inc.," which transfers ("sells") them to authorized Polaris dealers who offer the units for retail sale to public consumers.

[9] *See* doc. no. 68-1 (Sealed Anglea dep.), at 102-03.

[10] Doc. no. 59-1 (Redacted Anglea dep.), at 129-30.

never stamped onto the frame of the vehicle.[11]  Even so, plastic stickers bearing the number were applied to various parts of the vehicle as it moved along the plant's assembly line.[12]

Routine testing of vehicle No. 99 during the manufacturing process identified an issue known as "belt creep"[13] — a condition that occurs when the vehicle is "in a drive mode, could be either reverse or forward," and causes it to move without pressing on the accelerator.[14]  A Polaris employee documented the need to correct the condition in a "product information report" placed in the vehicle's glove compartment.[15]  The need for repair also was recorded in Polaris' electronic inventory tracking system, "PINpoint."[16]

Vehicle No. 99 was removed from the assembly line on July 6 or 7, 2020, and parked in an area outside the manufacturing plant generally referred to as the "rework area":  a location designated for storage of vehicles requiring repairs or additional work before being transferred to authorized Polaris dealers for sale.

Polaris conducted an inventory of all vehicles located in or around its

---

[11] *Id.* at 170.

[12] Doc. no. 104 (Transcript of Oral Argument), at 22-23.

[13] Doc. no. 59-1 (Redacted Anglea dep.), at 93-94.

[14] *Id*. at 129-30, 170.

[15] Doc. no. 68-1 (Sealed Anglea dep.), at 167-68.

[16] *Id.*

Limestone County manufacturing facility, including those parked in the rework area, during December of 2020.[17]  Vehicle No. 99 and twenty-eight others could not be found.[18]  The unaccounted-for vehicles were designated in the company's inventory tracking system[19] as "lost, stolen, or scrapped."[20]

Polaris issued a single invoice listing the twenty-nine unaccounted-for vehicles on January 14, 2021.[21]  That record-keeping procedure removed the vehicles from the company's inventory for accounting purposes.[22]  Jack Anglea, Polaris' corporate representative, said the action had the effect of moving the "lost, stolen, or scrapped" vehicles for record-keeping purposes from the warehouse inventory of the Limestone County plant to "Department 104," the designation for the company's corporate

---

[17] Doc. no. 59-1 (Redacted Anglea dep.), at 8-9.

[18] *Id*.; *id.* at 13-14.

[19] See notes 15 and 16, *supra*.

[20] Doc. no. 59-1 (Redacted Anglea dep.), at 39-40.

[21] Doc. no. 68-1 (Sealed Anglea dep.), at 233-34.

[22] *Id.* at 230, and doc. no. 68-3 (Sealed Invoice).  The invoice contained the following information:

> **SOLD TO**
> SCRAP/LOST OR STOLEN FG UNITS
> **ALWAYS COMMENT VIN***
> **DO NOT KEY PARTS ORDERS
> MINNEAPOLIS 55441

Doc. no. 68-3 (Sealed Invoice).  The same information appears in the "SHIP TO" section of the invoice.  The unit price for each of the twenty-nine unaccounted-for vehicles was listed as "0.00." *Id*.

headquarters.[23]

Twenty of the twenty-nine unaccounted-for vehicles eventually were located or their disposition otherwise explained, but No. 99 and eight others were not among them.[24]  In fact, vehicle No. 99 was not accounted for until some date after the events leading to this suit.[25]

Polaris contends that, in the normal course of business, each vehicle manufactured in its Limestone County plant was transferred ("sold") by Polaris Industries, Inc., to Polaris Sales, Inc.,[26] and the transaction recorded on a bill of sale.[27] Ownership was thereby transferred to the latter entity until the vehicle was transferred ("sold") to an authorized Polaris dealer.[28]  That transfer also was recorded on a separate bill of sale.[29]  There is no record of a transfer of vehicle No. 99 from either Polaris, Inc., or Polaris Industries, Inc., to Polaris Sales, Inc., nor from any of those entities to an authorized Polaris dealer.[30] Polaris' inventory system also did not show scanning of the vehicle for delivery outside the Limestone County manufacturing

---

[23] Doc. no. 68-1 (Sealed Anglea dep.) at 229-30.

[24] Doc. no. 59-1 (Redacted Anglea dep.), at 236-37.

[25] *Id*. at 116-18.

[26] Doc. no. 59-2 (Anglea decl.), ¶ 11.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.* ¶ 12.

facility, or scanning at a point of delivery.[31]

The owner of vehicle No. 99 on the date of the events leading to this suit was Haskell Joseph ("Joey") Lee,[32] who is the adoptive father of Robert Sims.[33]  Lee did not purchase vehicle No. 99 from a dealership authorized to sell Polaris vehicles.[34] Instead, the bill of sale reflects that he purchased the vehicle on January 24, 2021, from an individual identified only as "Justin Tate" of "Jones Valley, Alabama."[35]  The document does not contain a vehicle identification number, and states that it was sold "AS IS."[36]  It also states that Lee was to make payments to an unnamed individual in the monthly amount of $500, on the 15th day of each month, for an unspecified term.[37]

Lee's memory under oath was notoriously bad.  He denied remembering many things, including:  how he initially contacted "Justin Tate"; the purchase price of the vehicle; the name of the person to whom he made payments; and how he came into

---

[31] Doc. no. 59-1 (Redacted Anglea dep.), at 308-09.

[32] Doc. no. 59-6 (Lee dep.), at 18-19.

[33] *Id*. at 47.  Joey Lee's wife, Jacqueline R. Sims, is the biological mother of Robert Sims. *Id*. at 20-22.

[34] *Id*. at 49-50.

[35] Doc. no. 59-7 (bill of sale).

[36] This part of the Bill of Sale states that the buyer "acknowledges that the above vehicle is being sold AS IS, *and the buyer assumes all responsibility for future damages and/or liabilities resulting from the usage of this vehicle*." *Id.* (capitalization in original, italics added).

[37] *Id*.

possession of vehicle No. 99 (*i.e.*, whether it had been delivered to him).[38]  Lee did

not insure the vehicle, or register it for warranty purposes.[39]

Lee admitted that he was acquainted with a former Polaris employee named

Jason Johnson, whom he allegedly met through a mutual interest in fishing,[40] but

denied that he had talked to Johnson about the purchase of an all terrain vehicle, the

issues of this suit,[41] or borrowing money from Johnson for purchase of vehicle No.

99.[42]  Even so, Lee produced a ledger in which he had recorded seven payments to

Jason Johnson in the amount of $500 each during the months of February, March,

April, May, June, November, and December of 2021:  a total sum of $3,500.[43]  The

record also contains the affidavit of Jason Johnson stating that:

> In early 2021, I was acquainted with Haskell "Joey" Lee.  Mr. Lee
> expressed interest in a Polaris Ranger I owned.  Mr. Lee said he might
> be interested in buying a Ranger.  At that point the two of us began to
> look for available vehicles.  I found one on Facebook and told Mr. Lee
> about it.  He did not want that vehicle.  A short time later Mr. Lee told
> me he had found a vehicle he was interested in on Craigslist.  Mr. Lee
> provided me with the seller's name, and I called the seller and arranged
> to meet the seller in Winchester, Tennessee.
>
> I traveled to Winchester from Madison, Alabama and met the

---

[38] Doc. no. 59-6 (Lee dep.), at 47-51, 74.

[39] *Id.* at 59.

[40] *Id*. at 29-30, 35.

[41] *Id*. at 31.

[42] *Id.* at 29, 31, 54.

[43] *Id.* at 54-57.

seller of the Polaris.  I paid the seller $10,500.00 in cash and was told all the paperwork needed was in the vehicle glove compartment.  I then delivered the vehicle to Mr. Lee at his home.

I lent Mr. Lee $7,500.00 of the purchase price and he provided $3,000.00.  Mr. Lee was to repay me in payments, usually around $500.00 per month.  Mr. Lee did pay the entire amount.

I had no information that would have made me suspect the vehicle I delivered to Mr. Lee was stolen or of suspicious origin.

Doc. no. 63-1 (Johnson Affidavit).[44]

Plaintiffs conceded during oral argument that "theft is the most reasonable inference" that can be drawn from the facts set out in this section.[45]

## II.  PLAINTIFFS' MOTION TO STRIKE

Plaintiffs ask the court to strike paragraphs 19 and 25 of the declaration of Jack Anglea, contending that those paragraphs contain statements that contradict his deposition testimony.  The Eleventh Circuit explained the manner for evaluating such contentions in *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir. 1986), saying:

A definite distinction must be made between discrepancies which create transparent shams and discrepancies which create an issue of credibility or go to the weight of the evidence.  An opposing party's affidavit should be considered although it differs from or varies his

---

[44] Johnson's affidavit was submitted in support of the motion for summary judgment filed by defendant Indiana Mills & Manufacturing, Inc., and it was referred to during the deposition of Haskell Joseph ("Joey") Lee.  *See* doc. no. 59-6 (Lee dep.), at 54-57.

[45] Doc. no. 104 (Transcript of Oral Argument), at 38 ("we accept the idea that theft is the most reasonable inference"); *see also id*. at 39 ("But for purposes of today, we are perfectly willing to accept the inference that this thing was stolen.").

evidence as given by deposition or another affidavit and the two in conjunction may disclose an issue of credibility.

To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth. Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all. Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact. *An affidavit may only be disregarded as a sham "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party] thereafter [attempts to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony*."

*Id*. at 953-54 (quoting *Van T. Junkins & Associates v. United States Industries, Inc.*,

736 F.2d 656, 657 (11th Cir. 1984)) (emphasis and alterations supplied, some internal

citations and quotation marks omitted).

The Eleventh Circuit burnished that standard in the case of *Rollins v.*

*TechSouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987), saying that

our cases require a court to find *some inherent inconsistency* between an affidavit and a deposition before disregarding the affidavit. *If no inherent inconsistency exists*, the general rule allowing an affidavit to create a genuine issue "even if it conflicts with earlier testimony in the party's deposition," . . . governs. In these instances, any conflict or discrepancy between the two documents can be brought out at trial and considered by the trier of fact.

*Rollins*, 833 F.2d at 1530 (emphasis supplied) (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980)).  In summary, this Circuit's doctrine should only rarely result in the exclusion of evidence.  *See id.* (stating that the rule should be applied "sparingly because of the harsh effect [it] may have on a party's case") (alteration supplied).

## A.    Paragraph 19 of Anglea's Declaration

Paragraph 19 of Jack Anglea's declaration reads as follows:

> 19.    Based on [vehicle No. 99's] involvement and use in the July 4, 2021 incident underlying Plaintiffs' lawsuit, [Polaris Industries, Inc.] *later confirmed* that the Subject Ranger had been stolen, rather than lost or scrapped.

Doc. no. 59-2 (alterations and emphasis supplied), at 6.

Plaintiffs contend that paragraph "blatantly contradicts" Anglea's deposition testimony.  They offer the following transcript examples as support for their contention:

> Q.    Now, when did Polaris confirm, not for the lawyers and not by lawyer contact, I don't want to know about that, I want to know when, to your understanding, they confirmed that it was stolen? 99 was actually stolen?
>
> A.    Polaris confirmed it was stolen once the incident was made aware to Polaris.
>
> Q.    Okay.  So the — so the — let me just see if I can get this straight: To your understanding, the day they knew that there had been an

accident is the day that they said it was stolen — is that correct?

A.    I can't say the exact date, but after investigations through the AS400 system where we know — we labeled it as lost, missing or stolen –

Doc. no. 59-1 (Anglea dep.), at 116.

Q.    Let me stop you right there.  You labeled it as lost, missing or stolen, but you didn't know which one?

A.    We did not.

Q.    Correct.

A.    But — or now that the vehicle has been identified, it has never been registered, it did not go through what I — we can tell go through any dealer network, that's when we made the determination it must have been stolen.

Q.    That it must have been stolen.  Do you have any evidence that shows, other than the fact that it showed up outside of your factory, that it was stolen?

A.    We do not.

Q.    Okay.  So all of this about it being stolen is a supposition based on the fact that A, in an audit in December 2020 it was designated — it was found missing.  I just call it missing, gone, whatever.

A.    — stolen, lost —

*Id.* at 117.

Q.    By that fact, the fact that it was found outside our facility when it had been found to be missing before, therefore it was stolen?

12

A.      That is our conclusion, it was stolen from our inventory.

*Id.* at 118.

In addition to the foregoing, plaintiffs point to additional deposition transcript excerpts in which Anglea states that, at the time of the audit in December of 2020, until the time that vehicle No. 99 was discovered to have been the vehicle involved in the accident, the Polaris defendants classified it as "lost, stolen, or scrapped." Plaintiffs argue that, throughout his deposition, Anglea maintained that the Polaris defendants could not determine which of those categories applied to vehicle No. 99. Even so, Anglea testified that when the vehicle involved in the accident was identified as vehicle No. 99, the Polaris defendants concluded that it had been stolen, based upon the facts that the vehicle was designated as "lost, stolen, or scrapped" following the December 2020 audit, and that it ultimately was located at the accident scene (*i.e.*, it obviously had not been "scrapped," and was no longer "lost"). Anglea's statement in his declaration is not inherently inconsistent with his deposition testimony. Moreover, plaintiffs conceded at oral argument that the only reasonable inference to be drawn from the facts is that vehicle No. 99 was stolen. Thus, any discrepancy between Anglea's testimony and his declaration does not meet the high burden demanded by the Eleventh Circuit for striking evidence. Accordingly, this aspect of the motion will be denied.

**B.    Paragraph 25 of Anglea's Declaration**

Plaintiffs also ask the court to strike Paragraph 25 of Anglea's declaration,

which reads as follows:

> 25.    Based on *these circumstances*, it appears that designations
> of a "purchase" date and warranty start date of January 17, 2021 for the
> Subject Ranger on the Polaris website and in its internal systems are the
> result of automatic system generations that occurred once the January
> 14, 2021 invoice for the Subject Ranger was processed.  They do not
> indicate that the Subject Ranger was bought or sold.

Doc. no. 59-2, at 7 (emphasis supplied).  For context, the reference to "these

circumstances" relates to the four preceding paragraphs:  *i.e.*,

> 21.    Based on my own knowledge and a review of PII's [*i.e.*,
> Polaris Industries, Inc.] business records, I understand that certain of the
> Polaris digital systems reflect January 17, 2021, just three days after the
> January 14, 2021 invoice was issued, as a "purchase" date and a start
> date for a one-year standard factory warranty with respect to the Subject
> Ranger.

> 22.    For example, a download from PII's internal "digital twin
> system" reflects January 17, 2021 as a purported "Warranty Start" date
> for a one-year warranty on the Subject Ranger.  In connection with this
> litigation, I also understand that January 17, 2021 is reflected as a
> "Purchase Date" and warranty "Start Date" for the Subject Ranger when
> it is looked up using its associated VIN on Polaris's website. (Attached
> as Exhibit 8 to the Polaris defendants' Evidentiary Submission is an
> excerpted copy of PX 12 to the deposition of the Polaris Defendants'
> 30(b)(6) witness, which Plaintiffs' counsel represented at said
> deposition to be the VIN search result for the Subject Ranger from
> Polaris's website).

> 23.    In my experience at PII, [the] digital systems used by

Polaris automatically generate a purchase date and warranty start date for an off-road vehicle once an invoice for that off-road vehicle is processed. The system generations occur regardless of the reason for the invoicing and even if the relevant off-road vehicle has not actually been sold.

24.    The invoice for [vehicle No. 99] denoting it as "SCRAP/STOLEN/LOST" was issued on or around January 14, 2021. There is often an interim period between an invoice's issuance and its processing in my experience, meaning that the subject invoice was likely processed on or around January 17, 2021.

Doc. no. 59-2 (alterations supplied).

Plaintiffs argue that paragraph 25 directly contradicts Anglea's deposition testimony that he lacked familiarity with the Polaris VIN Search Tool, but that a member of the public could conclude, by using that website tool, that vehicle No. 99 had been "purchased." Polaris argues that, despite Anglea's admitted unfamiliarity with technical aspects of the VIN Search Tool, his deposition testimony is not contradicted by paragraph 25 of his declaration. In particular, Polaris points to Anglea's deposition testimony that the "purchase date" for vehicle No. 99 reflected in its digital systems was consistent with the date that Polaris removed the vehicle from its inventory system following the December 2020 audit.[46] Polaris contends that the paragraphs quoted above simply illuminate Anglea's deposition testimony on that point.

---

[46] Doc. no. 59-1 (Anglea dep.), at 287-88.

The court concludes that paragraph 25 of the declaration is not inherently inconsistent with Anglea's deposition testimony. Instead, the paragraph, viewed in the context of the preceding paragraphs, explains the manner of accounting for the missing vehicle in Polaris' internal business systems. Further, Anglea's statement that Polaris' records "do not indicate that the Subject Ranger was bought or sold" is not inconsistent with his deposition testimony agreeing that, notwithstanding, a member of the public who might view the website could conclude that the vehicle had actually been sold. For those reasons, the motion to strike paragraph 25 of the declaration will be denied.

### III. POLARIS' MOTION FOR SUMMARY JUDGMENT

Polaris' motion for summary judgment seeks dismissal of all claims alleged in plaintiffs' First Amended Complaint: *i.e.*, breach of the "Alabama Extended Manufacturer's Liability Doctrine" (Count I); negligence (Count II); negligent failure to warn (Count III); wantonness (Count IV); wanton failure to warn (Count V); and breach of warranty (Count VI).[47]

---

[47] Plaintiffs' original complaint contained the same claims. *See* doc. no. 1 (Original Complaint, filed May 22, 2023). In the course of investigating the events leading to the suit, however, defendants concluded that the vehicle driven by Robert Sims had been stolen from the Polaris manufacturing facility. Consequently, they asked the court to bifurcate discovery and dispositive motion practice, in order to first address the circumstances surrounding the manufacture of the subject Ranger and its alleged theft. *See* doc. no. 38 (Joint Motion to Amend Scheduling Order to Bifurcate Discovery and Dispositive Motions), ¶ 4; and doc. no. 40 (Amended Joint Motion of Defendants to Amend Scheduling Order to Bifurcate Discovery and Dispositive Motions), ¶¶ 4

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any materail fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all *reasonable* inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (emphasis supplied) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).

Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, *for such an inference is not based on the evidence, but is pure conjecture and speculation.*" *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration and emphasis supplied). Moreover,

---

& 10. The court granted the motions. Doc. no. 46 (Order entered April 24, 2024). Plaintiffs subsequently filed, with the consent of all defendants, their First Amended Complaint pursuant to Federal Rule of Civil Procedure 15(a)(2). *See* doc. no. 50 (Plaintiffs' Notice of Filing First Amended Complaint filed August 15, 2024); and doc. no. 51 (First Amended Complaint). That pleading is the operative document, and it asserts the state law claims stated in text against all defendants under the diversity of citizenship statute, 28 U.S.C. § 1332.

[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921 (alteration and emphasis supplied)).

## A.   Alabama Extended Manufacturer's Liability Doctrine

The question of whether a claim based upon the Alabama Extended Manufacturer's Liability Doctrine is viable when an unfinished all terrain vehicle is stolen from the producer, sold to a third party, and subsequently causes injury, appears to be an issue of first impression.

Polaris contends that plaintiffs cannot prevail on such a claim because defendants did not place vehicle No. 99 into the "stream of commerce." They argue that the vehicle was available for use on the date of the incident leading to this suit only because of the intervening criminal act of a third party or parties.

In response, plaintiffs contend that, because the vehicle ultimately ended up on the market — whether by theft or otherwise — Polaris may still be liable under Alabama's doctrine. Plaintiffs also argue that the presence of the vehicle's identification number in a public database specifying a date of "sale" and providing

warranty information would lead the public to believe that the vehicle had been legitimately placed into the stream of commerce.[48]

The Alabama Supreme Court announced the State's "extended" manufacturer's liability doctrine ("AEMLD") in two cases handed down on the same date: *Casrell v. Altec Industries, Inc.,* 335 So. 2d 128 (Ala. 1976), and *Atkins v. American Motors Corp.*, 335 So. 2d 134 (Ala. 1976). *Casrell* held that a defendant can be liable by "*placing* a product on the market causing personal injury or property damage, when used to its intended purpose." *Casrell*, 335 So. 2d at 132 (emphasis supplied). In order to establish liability under that doctrine, a plaintiff must show that the manufacturer *placed* the product into the stream of commerce —usually by sale. *Id.*; *see also Atkins*, 335 So. 2d at 141. Both cases required a plaintiff to show that the product "was expected to, and did, reach the user or consumer without substantial change in the condition in which it was *sold*." *Atkins*, 335 So. 2d at 141 (emphasis supplied).

The Alabama Supreme Court subsequently clarified that, even though AEMLD is similar to the doctrine of strict products liability defined by Section 402A of the Restatement (Second) of Torts, there is a key distinction between the two doctrines:

---

[48] Doc. no. 85 (Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment), at 30–31. Joey Lee's testimony that he never consulted Polaris' public website, or sought to register the vehicle for purposes of warranty, negates any argument that he relied on the website. *See* doc. no. 59-6 (Lee dep.), at 65, 68, 92.

19

*that is*, traditional tort liability defenses of contributory negligence,[49] assumption of the risk, or lack of causal relationship can be used to absolve a defendant of liability under the Alabama variation. *Sears, Roebuck & Co. v. Haven Hills Farm, Inc.*, 395 So. 2d 991, 994 (Ala. 1981). To do so, the *Sears* opinion held that fault is not determined by the conduct of the manufacturer, but by the performance of its product. *Id.* However, a later Alabama Supreme Court case, analyzing *Sears*, concluded that a plaintiff must still show that the manufacturer was the "one who *sold* a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer" in order to be liable under AEMLD. *Peek v. Merit Machinery Co.*, 456 So. 2d 1086, 1089 (Ala. 1984) (emphasis supplied).

The policy rationale undergirding AEMLD is a desire to equalize the market disparity between consumers and producers by requiring manufacturers to factor into the cost of production an element of liability insurance. *American States Insurance Co. v. Lanier Business Products*, 707 F. Supp. 494, 497–98 (M.D. Ala. 1989)

---

[49] Jason Johnson testified that Joey Lee called him later on the day of the events resulting in the death of Jayceon Sims, and said that his adopted son, plaintiff Robert Sims, had been

> acting a fool, that's his [Joey Lee's] word. But he said he [Robert Sims] was jumping the — the side-by-side [vehicle], and the last time he jumped it, it came down on the nose and flipped over. And then they went over there and . . . he [Joey Lee] took his grandson [Jayceon Sims] out and he was lifeless. Well, he was unconscious. So they called the ambulance, and then after that he find [*sic*] out that his neck was broken.

Doc. no. 102-1 (Johnson dep.), at 89-90 (alterations and ellipsis supplied).

(Thompson, J.).  The purpose was to "insure that the costs of injuries are borne by the manufacturers that *put* such products on the market rather than by the injured persons who are powerless to protect themselves."  *Id.* at 498 (quoting *Greenman v. Yuba Powers Products, Inc.*, 377 P.2d 897, 901 (Cal. 1963) (emphasis supplied)).

Thus, AEMLD generally requires a plaintiff to show that a manufacturer *sold* the product at issue in order for liability to attach, but the Alabama Supreme Court has clarified that there need not be a formal sale in order to hold a manufacturer liable.  *First National Bank of Mobile v. Cessna Aircraft Co.*, 365 So. 2d 966, 967 (Ala. 1978).  Even so, the manufacturer must maintain some level of control over the manner in which the product is placed on the market.  *Id.*  For example, if a manufacturer *leases* its product, *donates* the product, or *demonstrates* it to the general public, then the company is deemed to have maintained a sufficient level of control for liability to attach under AEMLD.  *Id.* at 968.  In each of the instances mentioned, the manufacturer is deemed to have *placed* the product into the stream of commerce, even if the company never formally *sold* the product.  *Id.*  In other words, the manufacturer retained sufficient control over the product for liability to attach.  *Id.* In addition, each of those methods looked toward a potential profit for the manufacturer.

Alabama courts have never addressed whether a manufacturer maintains

control of a product, or places the product into the stream of commerce, if the product is stolen from the defendant. Even so, the United States District Court for the Middle District of Alabama considered whether a company could be held liable under AEMLD for a product used internally, but not placed into the stream of commerce, in the case of *American States Insurance Co. v. Lanier Business Products*, *supra*. In that case, Lanier purchased a telephone power-supply box from another company (Toshiba of America, Inc.), and planned to resell such products to the general public. However, Lanier used the power-supply box at issue in that case for its own internal purposes, and that particular box caught fire. 707 F. Supp. at 495. The court concluded that Lanier could not be held liable under AEMLD, because Alabama's doctrine does not apply to a product used internally, and not intentionally placed into the stream of commerce. *Id.* at 498. This court finds that reasoning to be persuasive in the circumstances of this case.

In short, for a manufacturer to be liable under AEMLD, a defendant must intentionally place the product into the stream of commerce for the purpose of reaping a profit. The act of placement does not require proof of a formal sale; a lease, donation, or demonstration of the product can be sufficient, but the defendant must exert some measure of control over the product when it is placed into the stream of commerce. Further, that placement must be aimed at achieving some level of profit

in order to advance the policy rationale of AEMLD.

In contrast, a theft strips the manufacturer of control over the placement of the product into the stream of commerce, as well as the potential for profit.

Thus, this court concludes that a manufacturer cannot be held liable under AEMLD for a product that ended up in the stream of commerce because it was stolen by a third party.  To conclude otherwise would be to undermine the doctrine as it was established by the Alabama Supreme Court, as well as the policy rationale undergirding the doctrine—*i.e.*, a force to protect the consumer by imposing the cost of an injurious product on the manufacturer that placed the product into the stream of commerce.

Assuming, as did plaintiffs' counsel during oral argument,[50] that theft of vehicle No. 99 is the most reasonable inference that can be drawn from the facts, the theft stripped Polaris of control over the placement of the vehicle into the stream of commerce, and deprived the company of any profit Polaris might otherwise have realized.[51]  As a result, the Polaris defendants are entitled to summary judgment on

---

[50] Doc. no. 104 (Transcript of Oral Argument), at 38–39.

[51] This court agrees with Judge Thompson's conclusion in *American States Insurance Co. v. Lanier Business Products*, 707 F. Supp. 494 (M.D. Ala. 1989), that one of the primary policy rationales upon the AEMLD is premised is the manufacturer's or seller's "profit motive," which is why terms such as "sale," "stream of commerce," and "on the market" are normally used. *Id.* at 497; *see also id.* at 498 ("The emergence of a manufacturer's liability doctrine, in effect, required manufacturers who desired to introduce products into the market place to factor into the cost of production an element of liability insurance.").  The profit motive and such cost considerations

plaintiffs' AEMLD claim.

## B.    Negligence and Wantonness

Plaintiffs argue that the Polaris defendants were negligent because their lax security measures led to the theft of vehicle No. 99, and that was the "but-for" cause of the accident.[52] Polaris responds that plaintiffs' negligence and wantonness claims fail because they cannot establish that any act of the Polaris defendants was the proximate cause of the injuries complained of.[53]

In order to state a claim for negligence under Alabama law, a plaintiff must allege facts that plausibly show: "(1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury." *Albert v. Hsu*, 602 So. 2d 895, 897 (Ala. 1992). A claim for wantonness requires a plaintiff to prove that a defendant, "with reckless indifference to the consequences, consciously and intentionally [did] some wrongful act or omit[ted] some known duty." *Smith v. Davis*, 599 So. 2d 586, 588 (Ala. 1992) (alterations supplied). Further, "to be actionable, that act or omission must produce the plaintiff's injury." *Id.* Thus,

---

disappear when the product enters the market as the result of theft by a third party, and the bases for attaching liability to the manufacturer disappear.

[52] Doc. no. 85 (Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment) (redacted), at 39-44; doc. no. 90 (Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment) (sealed), at 39-44.

[53] Doc. no. 61 (Polaris Defendants' Brief in Support of Their Motion for Summary Judgment), at 23–27.

proximate cause is a necessary element of both negligence and wantonness. *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994).

Proof of proximate cause requires evidence of a "natural and continuous sequence, unbroken by any new independent causes," which "produces the injury[, and] without which the injury would not have occurred." *Id.* (alteration supplied). An "intervening, efficient cause" that is not "reasonably foreseeable" breaks the sequence of events, and prevents a defendant from being held liable. *Vines v. Plantation Motor Lodge*, 336 So. 2d 1338, 1339 (Ala. 1976).

"Foreseeability" is based on the *probability* that harm will occur — not a mere *possibility*. *Haddan v. Norfolk Southern Railway Co.*, 367 So. 3d 1067, 1076 (Ala. 2022). Intentional or criminal acts generally breach the chain of causation because the resulting harm is not reasonably foreseeable. *Alabama Power Co. v. Moore*, 899 So. 2d 975, 979 (Ala. 2004).

Polaris relies on *Vines* as support for its argument that the theft of vehicle No. 99 was an intervening cause of the complained of injuries. In that case, the defendant left his keys in the ignition of an unlocked truck in a dark alley. *Vines*, 336 So. 2d at 1339. The truck was stolen by an individual who was under the influence of drugs. *Id.* That individual crashed into a motorcycle on which the plaintiff and her husband were riding, injuring the plaintiff and killing her husband. *Id.* The plaintiff alleged

25

that the truck owner was negligent in violating a Birmingham city ordinance making it an offense to leave a vehicle unattended without removing its ignition keys. *Id.* at 1338. The Alabama Supreme Court resolved the question of the truck owner's liability under traditional concepts of proximate cause, observing that the essential point for deciding the case was the "foreseeability" that personal injury or death would result from leaving keys in the ignition of an unlocked truck. *Id.* at 1339 ("The key here is foreseeability."). The Court concluded that "the negligent or wanton act of the thief resulting in the injury and in the death, could not be reasonably foreseen by the defendant; it is sufficient to break the chain of causation." *Id.* at 1340. Instead, "the negligent driving of the thief was the proximate cause of the injuries; defendant's negligence, if any, was too remote to be a proximate cause of those injuries." *Id.*

While *Vines* is instructive, Alabama courts have not discussed whether a defendant is liable under a negligence theory if he or she failed to secure a dangerous product that is stolen and transferred to a third party, who then causes the injury. Even so, other courts have discussed similar fact patterns. For example, the Missouri Court of Appeals analyzed the issue of proximate cause in a negligent shooting case. *Finocchio v. Mahler*, 37 S.W. 3d 300, 304 (Mo. Ct. App. 2000). A father kept a handgun in his dresser, and its ammunition in his night stand. *Id.* at 301. While the

father was absent, his daughter allowed one of her teenage friends into the house —

a friend whom the father had told his daughter not to allow into the house, because

the father suspected that the unwelcome friend had stolen his wrenches.  *Id.*  The

friend found the gun, stole it, accidentally discharged the firearm, and thereby killed

an individual.  *Id.* at 302.  The court concluded that the father was not liable, because

any negligence on his part in the storage of the firearm and its ammunition was not

the proximate cause of the fatality.  *Id.* at 303–04.  Specifically, there were three acts

over which the father had no control, two of them criminal, and those acts broke the

chain of causation.  *Id.* at 303–04.

Similarly, the Ninth Circuit Court of Appeals analyzed whether a Bureau of

Land Management Ranger could be liable for a death caused by a gun stolen from his

automobile.  *Steinle v. United States*, 17 F.4th 819, 822 (9th Cir. 2021).  The Ranger

left a loaded handgun in a backpack inside his automobile.  *Id.*  An individual broke

into the vehicle, stole the backpack, found the gun, removed it, wrapped it in cloth,

and either abandoned or lost the firearm a half-mile away.  *Id.*  Four days later,

another person found the firearm, fired it aimlessly, and struck and killed the

plaintiffs' daughter.  *Id.*  The court concluded as a matter of law that the foregoing

"Rube Goldbergesque system of fortuitous linkages" was too tenuous to establish

proximate causation.  *Id.*

27

This court finds the reasoning of the Missouri Court of Appeals and the Ninth Circuit to be persuasive. Here, the relationship between the theft of vehicle No. 99 — the most reasonable inference that can be drawn from the facts — and the accident the following year is too tenuous to establish proximate cause. The court assumes for the sake of discussion that: (**1**) vehicle No. 99 was stolen from the Polaris defendants' Limestone County facility sometime between July 6 or 7, 2020 (when it was removed from the manufacturing line and relocated to the rework area), and the December 2020 audit; (**2**) the vehicle was stolen because the plant's security was not adequate to prevent theft of an unfinished vehicle stored in the rework area;[54] (**3**) Joey Lee subsequently purchased vehicle No. 99 from a man identified only as "Justin Tate" during January of the following year; (**4**) Lee allowed his adopted son to drive the vehicle nearly six months later, on July 4, 2021; and (**5**) the accident ensued. Thus, theft was not the only event that broke the chain of causation. Instead, there were multiple discrete events over a period of several months, including a criminal act, that intervened, underscoring the remoteness of the Polaris defendants' lax security measures to the death and injuries complained of.

---

[54] Notably, there were no thefts of vehicles from Polaris' Limestone County manufacturing facility from 2016 through 2019, and only four thefts in the year that vehicle No. 99 was stolen. Doc. no. 59-2 (Anglea decl.) ¶ 20; doc. no. 92-2 (Huntsville Polaris Security Brief & Overwatch Shift Change Orientation Power Point Presentation), at ECF 13. Those facts undermine the "reasonable foreseeability" of the injuries complained of.

Accordingly, the court concludes that, as a matter of law, plaintiffs cannot establish proximate cause, and the Polaris defendants are entitled to summary judgment on plaintiffs' negligence and wantonness claims.

## C.    Failure to Warn

Polaris argues that summary judgment is warranted on plaintiffs' failure to warn claims because it did not "supply" vehicle No. 99 — an essential element of the claim.[55]  Plaintiffs subsequently abandoned their failure to warn claims and accept their dismissal.[56]  But, even if plaintiffs had not abandoned the claims, defendants would still be entitled to summary judgment.

Alabama has adopted § 388 of the Restatement (Second) of Torts (1965), recognizing a cause of action against a manufacturer for negligent failure to warn of dangers created by its product.  *Purvis v. PPG Industries, Inc.*, 502 So. 2d 714, 719

---

[55] Doc. no. 61 (Polaris Defendants' Brief in Support of Their Motion for Summary Judgment), at 27-28.

[56] Plaintiffs also abandoned their breach of warranty claims.  Doc. no. 101 (Notice of Voluntary Dismissal of Certain Claims); *see also* doc. no. 104 (Transcript of Oral Argument), at 61. Plaintiffs' notice states that:

> Plaintiffs hereby voluntarily dismiss, with prejudice, their claims for breach of warranty and failure to warn against the Polaris Defendants.
>
> These claims are withdrawn in order to streamline the issues presently before the Court.  Plaintiffs' remaining claims for negligence, wantonness, and under the Alabama Extended Manufacturer's Liability Doctrine are unaffected by this dismissal.

Doc. no. 101 (Notice of Voluntary Dismissal of Certain Claims).

(Ala. 1987). Under that theory, a supplier has a duty to warn if it knows, or has reason to know, that the chattel is dangerous for the use for which it is supplied. *Id.* Comment a of § 388 states, however, that "in all probability the rule stated would not apply in favor of a thief of the chattel, or one injured while the thief is using it."

Alabama has not specifically addressed this issue, but other jurisdictions have, and all conclude that a defendant is not liable if a plaintiff is injured by a product that was either not supplied to the market, or was stolen, or used without permission. For example, the Washington Court of Appeals held that a plaintiff could not bring a claim against the owner of a golf cart because the plaintiff was not an authorized user. *Schinkelshoek v. Empire Seed Co.*, 806 P.2d 1263, 1265–66 (Wash. Ct. App. 1991). The Ohio Court of Appeals came to the same conclusion for another episode of the unauthorized use of a golf cart. *Wanko v. Downie Productions, Inc.*, 2000 WL 1199235, at *6–8 (Ohio Ct. App. Aug. 24, 2000). Finally, the Fifth Circuit Court of Appeals held that the Bureau of Alcohol, Tobacco, and Firearms did not owe a duty to warn a plaintiff about the use of a dangerous M-80 explosive because the explosive was stolen from the ATF. *Tindall by Tindall v. United States*, 901 F.2d 53, 54-56 (5th Cir. 1990).[57]

---

[57] Conversely, the Pennsylvania Superior Court held that a supplier of a dangerous chemical who distributed that chemical to a city could be liable when a third person was injured due to an explosion, despite it being stolen from the city by a third party. *Pegg v. General Motors Corp.*, 391 A.2d 1074, 1081–82 (Pa. Super. Ct. 1978). However, this case can be distinguished by a critical

The critical difference between the preceding cases and this one is that Polaris did not *supply* vehicle No. 99. The vehicle was stolen before it was placed on the market or supplied to a third person. Thus, Polaris had no duty to warn of any danger, and summary judgment will be granted as to plaintiffs' failure to warn claims.

## D.    Breach of Warranty

Finally, Polaris argues that plaintiffs' breach of warranty claim should be dismissed because Polaris did not sell vehicle No. 99.[58] Plaintiffs do not directly respond to that argument, but argue that it is unclear whether vehicle No. 99 was stolen, and if it was not stolen, then there would be a warranty.[59] As stated in the previous section, however, plaintiffs conceded that they have abandoned their breach of warranty and failure to warn claims against the Polaris defendants, and accept their dismissal with prejudice on summary judgment.[60] However, even if plaintiffs had not abandoned the claim, defendants would still be entitled to summary judgment.

If there is no contract between two parties for a product, then there is no

_____

point. The product was not stolen from the *supplier* — it was stolen from a customer — meaning that the supplier had already placed the object in the stream of commerce. Once it was supplied to the market, then it was a question of fact whether the supplier failed to warn the consumer. *Id.*

[58] Doc. no. 61 (Polaris Defendants' Brief in Support of Their Motion for Summary Judgment), at 28–30.

[59] Doc. no. 90 (Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment), at 28–31.

[60] See note 56, *supra* (citing and quoting doc. no. 101 (Notice of Voluntary Dismissal of Certain Claims)); *see also* doc. no. 104 (Transcript of Oral Argument), at 61.

31

implied warranty. *See* Ala. Code § 7-2-314 (implied warranty of merchantability); Ala. Code § 7-2-315 (implied warranty for fitness for a particular purpose). Likewise, an express warranty is created by the seller who makes an affirmation of fact or promise about the product, which then becomes the basis for the bargain. Ala. Code § 7-2-313. Thus, if there is no contract between two parties for a product, then there is no express warranty either. *See id.*

Here, as stated previously, the court concludes that the most reasonable inference to be drawn from the facts is that vehicle No. 99 was stolen from the Polaris defendants' Limestone County facility. Thus, there was no sale, no contract, and accordingly, no express or implied warranties. Therefore, Polaris is entitled to summary judgment on plaintiffs' breach of warranty claim.

### IV. CONCLUSION

For all of the foregoing reasons, the Polaris defendants' motion for summary judgment will be granted, and all of plaintiffs' claims against them will be dismissed. A separate final judgment will be entered contemporaneously herewith.

**DONE** this 19th day of March, 2026.

Lynwood Smith

_____
Senior United States District Judge